IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ERIKA BRYANT SARGENT, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | Civil Action No. 11-186 |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| Defendant. | ) | |
| | ) | |

**MEMORANDUM OPINION**

**I.    Introduction**

Erika Bryant Sargent ("Plaintiff") brings this action pursuant to 42 U.S.C. §§ 405(g) and

1383(c)(3), seeking judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying her application for disability insurance benefits ("DIB") and

supplemental security income ("SSI") benefits under Titles II and XVI of the Social Security Act

("Act").    42 U.S.C. §§ 401–433, 1381–1383(f).    The record has been developed at the

administrative level. For the following reasons, the Court finds that the decision of the

Administrative Law Judge ("ALJ") is supported by substantial evidence.    Therefore, the

Commissioner's Motion for Summary Judgment (Docket No. 11) is GRANTED and the

Plaintiff's Motion for Summary Judgment (Docket No. 6) is DENIED.

## II.     Procedural History

Plaintiff filed for DIB and SSI benefits with the Social Security Administration on January 5, 2009, claiming an inability to work due to disability as of May 15, 2007. (R. at 13)[1]. Plaintiff was initially denied benefits on March 23, 2009. (R. at 13). A hearing was scheduled for August 13, 2009, and Plaintiff appeared to testify represented by counsel. (R. at 13). A vocational expert also testified. (R. at 13). The Administrative Law Judge ("ALJ") issued a decision denying benefits to Plaintiff on September 14, 2009. (R. at 13–22). Plaintiff filed a request for review of the ALJ's decision by the Appeals Council, which was denied on January 19, 2011, thereby making the decision of the ALJ the final decision of the Commissioner. (R. at 6–8).

Plaintiff filed her Complaint in this Court on February 10, 2011. (Docket No. 1). Defendant filed his Answer on April 15, 2011. (Docket No. 2). Cross motions for summary judgment followed. (Docket Nos. 6, 11).

## III.     Factual Background

### A.     General Background

Plaintiff was born on March 8, 1987, making her 20 years old at the alleged onset date (May 15, 2007) and 22 years old at the time of her hearing before the ALJ (August 13, 2009). (R. at 13). She was born in Washington, Pennsylvania and raised in Richeyville, Pennsylvania. (R. at 111). Her parents divorced around 2008. (*Id.*). Plaintiff's mother reportedly has bipolar disorder with depression and her brother has substance abuse issues. (*Id.*). When Plaintiff was 11 years old she was sexually abused by a man (her current husband's cousin) while baby-sitting

---

[1]     Citations to Docket Nos. 3–3-3, the Record, hereinafter, "R. at ___."

his children; this abuse reportedly continued for a year and a half until it was discovered. (*Id.*).

Plaintiff completed the 10th grade and has not earned a GED. (R. at 323). She last worked in

May 2007 as a nursing assistant. (*Id.*). Plaintiff married in October 2008. (R. at 111). Her

husband worked at a steel mill but was laid off in December 2008. (*Id.*). He began receiving

$1,420 monthly in unemployment compensation in January 2009. (R. at 314).

## B.      Plaintiff's Medical Background

In Plaintiff's Disability Report form, she claims disability due to hepatitis C, history of

drug abuse, depression, and methadone maintenance. (R. at 57). She claimed that she stopped

working "because of [her] condition," although she testified before the ALJ that she stopped

working in May 2007 because of her pregnancy. (R. at 57, 323). In her Supplemental Function

Questionnaire, Plaintiff reported that her fatigue "has been progressing over the last 2 years" and

that she is fatigued "all day long." (R. at 75). She described pain "in my lower back, legs, and

right side," that has progressively worsened and continues throughout the day. (R. at 76).

Plaintiff associated this pain with her hepatitis C. (*Id.*).

### 1.      Hepatitis C

On April 12, 2007, Plaintiff saw Dr. Dawson Lim in Monongahela, PA. (R. at 252). Dr.

Lim documented that approximately a year earlier Plaintiff had been diagnosed with hepatitis C[2]

by a doctor in Uniontown, but that Plaintiff had not received follow-up treatment. (*Id.*). Dr. Lim

noted that Plaintiff complained of "easy fatiguing and weakness, sometimes profound" during

---

[2]        "Hepatitis C is one type of hepatitis - a liver disease - caused by the hepatitis C virus (HCV). It usually
spreads through contact with infected blood. It can also spread through sex with an infected person and from mother
to baby during childbirth. . . . Usually, hepatitis C does not get better by itself. The infection can last a lifetime and
may lead to scarring of the liver or liver cancer. Medicines sometimes help, but side effects can be a problem."
MEDLINE PLUS: HEPATITIS C, *available at* http://www.nlm.nih.gov/medlineplus/hepatitisc.html (last visited August
30, 2011).

the previous four to five months.  (*Id.*).  He assessed that "these symptoms may or may not be related to her hepatitis C," and he recommended further workup. (*Id.*).

Plaintiff began seeing Dr. Hossam Kandil, MD at the University of Pittsburgh Medical Center on November 23, 2007 for hepatitis C, genotype 1.[3]  (R. at 90, 94–95).  At this visit, Dr. Kandil noted that Plaintiff complained of "occasional nausea and occasional vomiting. Otherwise, [she] denies any symptoms."  (*Id.*).  Plaintiff was 32-weeks pregnant at this visit, and Dr. Kandil recommended delaying hepatitis C treatment until after delivery.  (*Id.*).

On June 2, 2008 Plaintiff followed up with Dr. Kandil.  (R. at 90).  He noted that they chose to wait until Plaintiff's son was two years old before starting hepatitis C treatment because of her current childcare demands.  (*Id.*).  At this visit, Plaintiff was "overall doing well" and "denie[d] any symptoms."  (*Id.*).  When Plaintiff saw Dr. Kandil again on December 9, 2008, she complained of "extreme fatigue and lack of sleep because of her childcare [demands] and occasional […] fainting."  (R. at 86).  She also described stress at home related to her husband losing his job.  (*Id.*).  Dr. Kandil assessed that these symptoms were probably caused by poor sleep, inadequate dietary intake, and stress, rather than by hepatitis C.  (R. at 87).

On January 20, 2009, Plaintiff began seeing Dr. R. Fraser Stokes, MD and his associates at Southwestern Gastrointestinal Specialists, P.C. for her hepatitis C treatment.  (R. at 133).  Dr. Stokes explained that Plaintiff moved her care from Dr. Kandil because she felt that Dr. Kandil "'kept her in the dark.'"  (*Id.*).  At this visit, Plaintiff reported fatigue.  (*Id.*).  An ultrasound on January 26, 2009 showed that Plaintiff's liver was "normal other than limited evaluation of the pancreatic tail." (R. at 232).  On February 24, 2009, Dr. Stokes and Plaintiff decided to start active hepatitis treatment.  (*Id.* at 135).  On March 13, 2009, Plaintiff began treatment, including

---

[3]     Hepatitis C, "[g]enotype 1 is the most common type but is relatively resistant to treatment.   Combination therapy is given for 1 [year]; a sustained response rate of about 45 to 50% overall occurs."  THE MERCK MANUAL OF DIAGNOSIS AND THERAPY 230 [hereinafter MERCK MANUAL] (Mark H. Beers et al eds., 18th ed. 2006).

Pegasys (Interferon)[4] injections of 180 mg weekly and ribavarin[5] twice daily.  (*Id.* at 137).  She experienced "significant flu-like symptoms" during her first week of treatment but continued to take the medications.  (R. at 138).

On March 16 and March 20, 2009, Plaintiff asked Dr. Stokes for documentation of her hepatitis treatment to provide to her husband's employer so that he could take a leave from work.  (*Id.*).  Plaintiff expressed concerns about caring for her 14-month old baby because of the side effects she was experiencing as a result of her treatment.  (*Id.*).  Dr. Stokes declined to provide this documentation unless Plaintiff "would become disabled from the side effects which is rare."  (*Id.*).

During her subsequent appointments with Dr. Stokes's colleague, Dr. Frederick W. Ruthardt, M.D. on April 10, 2009 and May 8, 2009, Plaintiff continued complaining of flu-like symptoms, including dizziness, fatigue, nausea, and decreased appetite.  (R. at 139–143).  Plaintiff also began complaining of blurred vision, heartburn, burning of the tongue, and anxiety attacks, with which Plaintiff reported chest pain, shortness of breath, and sweaty palms.  (R. at

---

[4]    The generic name for Pegasys Pfs is Peginterferon alfa-2a.  This medication "is used alone or in combination with ribavirin . . . to treat chronic . . . hepatitis C infection. . . .  Peginterferon is a combination of interferon and polyethylene glycol, which helps the interferon stay active in your body for a longer period of time. Peginterferon works by decreasing the amount of hepatitis C virus (HCV) or hepatitis B virus (HBV) in the body."  MEDLINE PLUS, PEGASYS, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605029.html  (last visited August 30, 2011).  Adverse effects "are the same as those of standard [Interferon] but may be marginally less severe.  In a few patients, treatment needs to be abandoned due to intolerable adverse effects.  The drug should be given cautiously or not at all to patients with ongoing substance abuse or major psychiatric disorders."  MERCK MANUAL, *supra* n. 3, at 230.

[5]    The generic name for Ribapak is Ribavirin.  "Ribavirin is used with another medication called an interferon to treat hepatitis C. Ribavirin is in a class of antiviral medications called nucleoside analogues. It works by stopping the virus that causes hepatitis C from spreading inside the body. It is not known if treatment that includes ribavirin and another medication cures hepatitis C infection." MEDLINE PLUS, RIBAVIRIN, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605018.html (last visited August 30, 2011).  "Ribavirin is usually well tolerated but commonly produces anemia due to hemolysis. MERCK MANUAL, *supra* n. 3, at 230.

139, 141–142).  Dr. Ruthardt prescribed 20 mg Omeprazole[6] daily to treat the heartburn and 0.25 mg Xanax[7] every eight hours as needed to treat the anxiety.  (R. at 141-143).  After four weeks of treatment, Plaintiff's viral load was "undetectable . . . which is an excellent prognostic indicator," and the hepatitis treatment continued.  (R. at 141).  Dr. Ruthardt suspected that some of Plaintiff's symptoms were caused by anemia and referred her to a hematologist, Dr. Peracha for evaluation.  (R. at 141–142).

### 2.    *Anemia*

On June 1, 2009, Plaintiff saw Dr. Sajid M. Peracha, M.D. at UPMC Cancer Centers in Uniontown for an anemia work-up. (R. at 276–278).  He prescribed for Plaintiff injections of Aranesp[8] 200 mcg every two weeks.  (R. at 276, 278).  On August 6, 2009, Plaintiff complained of right upper quadrant tenderness, which Dr. Peracha assessed may be caused by an infection.  (*Id*.).  He documented that Plaintiff "is tired to the point where she cannot even help her son get ready without taking a break."  (*Id*.).  Finding that Plaintiff's hemoglobin level remained low, Dr. Peracha increased the Aranesp dose to 300 mcg.  (*Id*.).

### 3.    *Substance Abuse*

Plaintiff began substance abuse treatment at Addiction Specialists, Inc. ("A.S.I.") in August 2006, when she was 14 years old.  (R. at 103).  She reported first using opiates at age 12

---

[6]     Omeprazole, the generic name for Prilosec, is a medication used to treat gastroesophageal reflux disorder. MEDLINE PLUS: OMEPRAZOLE, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html, (last visited August 30, 2011).

[7]     Xanax (generic name: alprazolam) is in a benzodiazepine and "is used to treat anxiety disorders and panic disorder. . . . It works by decreasing abnormal excitement in the brain." MEDLINE PLUS: ALPRAZOLAM, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a684001.html (last visited August 30, 2011).

[8]     Aranesp, the brand name for darbepoetin alfa injections, "is used to treat . . . anemia caused by chemotherapy (medications to treat cancer). Darbepoetin alfa is in a class of medications called erythropoiesis-stimulating agents (ESAs). It works by causing the bone marrow (soft tissue inside the bones where blood is made) to make more red blood cells. MEDLINE PLUS: DARBEPOETIN ALFA INJECTIONS, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a604022.html (last visited August 30, 2011).

and that heroin was her drug of choice. (R. at 106). The staff reported that Plaintiff "is aware of her addiction. [She] came to A.S.I. to live a clean and structured life style." (R. at 102). The clinicians and Plaintiff agreed that she would begin attending NA groups for support. (*Id.*). Plaintiff has also been admitted to Twin Lakes for 6 days because of her addiction, although the record does not contain further documentation of this treatment. (R. at 110).

Plaintiff received ongoing methadone[9] treatment at A.S.I. (R. at 99–101). Records from May 2008 through December 2008 show that the methadone dosages fluctuated, with Plaintiff requesting a reduced dose in May–August 2008, but requesting an increased dose beginning in December 2008 because of increased pain. (R. at 101). Her treatment plan dated January 7, 2009 states that Plaintiff's long-term goal was to decrease and eventually stop methadone. (R. at 99). Her methadone dose at this time was 75 mg daily. (R. at 100). According to records from Dr. Stokes, the methadone dose was again increased in March 2009 to 85 mg daily. (R. at 138).

### 4. *Psychiatric Conditions*

Plaintiff began psychiatric treatment at Chestnut Ridge Counseling Services, Inc. in January 2009. (R. at 110–115). On January 30, 2009, Nurse Practitioner Bonita Roche, CRNP conducted an initial psychiatric evaluation. (R. at 110–113). Ms. Roche noted that the hepatitis C medication Plaintiff was prescribed may increase depression.[10] (R. at 110). She reported that

---

[9]    Methadone "is used to prevent withdrawal symptoms in patients who were addicted to opiate drugs and are enrolled in treatment programs in order to stop taking or continue not taking the drugs. Methadone is in a class of medications called opiate (narcotic) analgesics. Methadone works to treat pain by changing the way the brain and nervous system respond to pain. It also works as a substitute for opiate drugs of abuse by producing similar effects and preventing withdrawal symptoms in people who have stopped using these drugs." MEDLINE PLUS, METHADONE, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a682134.html (last visited August 30, 2011).

[10]    "Peginterferon alfa-2a may cause or worsen the following conditions which may be serious or cause death: infections; mental illness including depression, mood and behavior problems, or thoughts of hurting or killing

Plaintiff was diagnosed with depression at age 14 and started on an antidepressant, but stopped the medication because of side effects and did not follow-up with treatment. (*Id*.). At this visit, Plaintiff complained of "severe depression," describing fatigue, frequent crying, isolation, poor energy, lack of interest, and severe anxiety attacks. (*Id*.).

Upon examination, Ms. Roche assessed Plaintiff as fully oriented, with good memory and an average fund of knowledge. (R. at 112). However, Plaintiff's concentration and attention were poor, and her impulse control, judgment, and insight were impaired. (*Id*.). Ms. Roche diagnosed Plaintiff with Major Depressive Disorder,[11] Rule-out Bipolar Disorder,[12] History of Heroin Abuse,[13] "moderately severe" psychosocial stressors,[14] and a Global Assessment of

---

yourself; starting to use street drugs again if you used them in the past . . . ." MEDLINE PLUS, PEGINTERFERON, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a605029.html (last visited August 30, 2011).

[11]     "Major depressive disorder, also called major depression, is characterized by a combination of symptoms that interfere with a person's ability to work, sleep, study, eat, and enjoy once–pleasurable activities. Major depression is disabling and prevents a person from functioning normally. Some people may experience only a single episode within their lifetime, but more often a person may have multiple episodes." NAT'L INST. OF MENTAL HEALTH, DEPRESSION, *available at* http://www.nimh.nih.gov/health/publications/depression/what-are-the-different-forms-of-depression.shtml (last visited August 30, 2011).

[12]     "Bipolar disorder, also known as manic-depressive illness, is a brain disorder that causes unusual shifts in mood, energy, activity levels, and the ability to carry out day-to-day tasks. Symptoms of bipolar disorder are severe. They are different from the normal ups and downs that everyone goes through from time to time. Bipolar disorder symptoms can result in damaged relationships, poor job or school performance, and even suicide. But bipolar disorder can be treated, and people with this illness can lead full and productive lives." NAT'L INST. OF MENTAL HEALTH, BIPOLAR DISORDER, *available at* http://www.nimh.nih.gov/health/publications/bipolar-disorder/what-is-bipolar-disorder.shtml (last visited August 30, 2011).

[13]     A diagnosis of an active substance abuse disorder requires "[a] maladaptive pattern of substance use leading to clinically significant impairment or distress . . . occurring within a 12-month period." AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS [hereinafter DSM], 199 (4th ed, T.R. 2000). Additionally, the disorder must not qualify as dependence, a disorder indicated by tolerance and withdrawal. (*Id*. at 198).

[14]     Psychosocial and environmental problems relevant to psychiatric assessment include "problems that may affect the diagnosis, treatment, and prognosis of mental disorders." (*Id*. at 31).

Functioning ("GAF") score of 52.[15] (*Id.*). Plaintiff was prescribed Lithium,[16] starting at 150mg each night, and Seroquel,[17] 50mg each night. (*Id.*).

On February 24, 2009, Plaintiff reported to Dr. Stokes that she was taking Celexa[18] and was "tolerating the [psychiatric] treatment well and feels it is working to control her depression." (R. at 135). On March 20, 2009, Plaintiff saw Dr. Stokes about the adverse physical reactions she experienced after starting hepatitis treatment, but Plaintiff reported that her mental health remained stable. (R. at 138).

### 5.    *Other Medical Conditions*

On March 18, 2008, Plaintiff went to Monongahela Valley Hospital Emergency Room complaining of pain after falling while carrying her child. (R. at 255). She was discharged from the ER that day with an ace wrap and pain medication. (R. at 260). An MRI of her elbow on May 23, 2008 was normal other than subtle irregularities that indicated a bone injury. (R. at 264). An MRI of her lower back on November 18, 2008 was normal. (R. at 261).

---

[15]    The GAF score refers to "the clinician's judgment of the individual's overall level of functioning." (*Id.* at 32). A score of 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." (*Id.* at 34). A GAF score of 60 indicates "[m]oderal symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." (*Id*).

[16]    "Lithium is used to treat and prevent episodes of mania . . . in people with bipolar disorder . . . . Lithium is in a class of medications called antimanic agents. It works by decreasing abnormal activity in the brain. . . . Lithium is also sometimes used to treat . . . depression." MEDLINE PLUS, LITHIUM, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a681039.html (last visited August 17, 2011).

[17]    Seroquel is a brand name of the medication quetiapine, which is "used alone or with other medications to treat or prevent episodes of mania . . . or depression in patients with bipolar disorder . . . . Quetiapine is in a class of medications called atypical antipsychotics. It works by changing the activity of certain natural substances in the brain." MEDLINE PLUS, QUETIAPINE, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a698019.html (last visited August 17, 2011).

[18]    Celexa is a brand name of the medication citalopram, a medication "used to treat depression. Citalopram is in a class of antidepressants called selective serotonin reuptake inhibitors (SSRIs). It works by increasing the amount of serotonin, a natural substance in the brain that helps maintain mental balance." MEDLINE PLUS: CITALOPRAM, *available at* http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699001.html (last visited August 17, 2011).

### 6. Residual Functional Capacity Assessment

On March 17, 2009 Dr. Richard A. Heil, Ph.D. reviewed Plaintiff's file and completed a Psychiatric Review Technique Form. (R. at 116–128). He diagnosed Plaintiff with Major Depressive Disorder, PTSD,[19] Panic Disorder,[20] and Polysubstance Abuse.[21] (R. at 119, 121, 124). He reported that Plaintiff has "mild" restrictions in her activities of daily living, has "moderate" difficulties in maintaining social functioning, concentration, persistence, or pace, and has no repeated episodes of decompensation. (R. at 126).

Dr. Heil also completed a Mental Residual Functional Capacity Assessment for Plaintiff. (R. at 129–131). In his opinion, Plaintiff was able to follow simple instructions, make simple decisions, and perform simple, routine, repetitive work in a stable working environment. (R. at 131). He noted that Plaintiff had limited ability to understand or remember complex or detailed instructions. (*Id.*). Overall, Dr. Heil assessed that Plaintiff's psychological symptoms would not prevent her from completing a normal workday. (*Id.*). He found Plaintiff's statements about her disability "partially credible." (*Id.*). Dr. Heil concluded that "[s]everity of disabling proportions has not been demonstrated." (*Id.*).

### 7. Physicians' Short Form

Plaintiff's primary care physician is Dr. Raymond F. Nino. (R. at 248–251). He completed a Physician's Short Form on August 11, 2009, in which he states that Plaintiff was

---

[19] Posttraumatic stress disorder (PTSD) refers to an anxiety disorder whose symptoms develop "following exposure to an extreme traumatic stressor involving direct personal experience." DSM, *supra* n. 13, at 463.

[20] "Panic disorder is an anxiety disorder. It causes panic attacks, which are sudden feelings of terror for no reason." Symptoms include fast heartbeat, chest pain, difficulty breathing, and dizziness. MEDLINE PLUS: PANIC DISORDER, *available at* http://www.nlm.nih.gov/medlineplus/panicdisorder.html (last visited August 17, 2011).

[21] Although polysubstance use is not recognized as a formal diagnosis in the DSM IV-TR, polysubstance dependence refers to "behavior during the same 12-month period in which the person was repeatedly using at least three groups of substances . . . but no single substance predominated." DSM, *supra* n. 13, at 293.

unable to perform activities of daily living because of her "chemotherapy for Hepatitis C." (R. at 248). He checked that Plaintiff was not able to: lift or carry, work at unprotected heights, work around moving machines, or be exposed to marked temperature changes. (R. at 248–250). Dr. Nino assessed that Plaintiff could occasionally: use her head and neck, bend, squat, kneel, climb, and crawl, be exposed to dust, fumes, gases, and odors, reach above or below shoulder level, or use her hands and arms for pushing and pulling. (*Id.*). Dr. Nino remarked that Plaintiff could "frequently": use her hands and arms for grasping and manipulation. (R. at 250). In his opinion, Plaintiff was "disabled" indefinitely. (R. at 251).

### C.    Hearing before ALJ

Plaintiff's application for Title II disability and disability insurance benefits and her Title XVI application for Supplemental Security Income were reviewed on August 13, 2009 at a hearing before Administrative Law Judge Amy Chain. (R. at 13). At the hearing, Plaintiff was represented by attorney Stephen J. O'Brien, Esquire. (*Id.*). An impartial vocational expert, Samual E. Edelman, M.Ed.[22] also testified. (*Id.*).

Plaintiff testified that she stopped working in May 2007 because of her pregnancy. (R. at 323). She said that she has not worked since this time and explained that her family has supported her financially. (*Id.*). Plaintiff reported that her hepatitis treatment causes her body to ache, and that "most days" she "can't get out of bed." (R. at 324). She said the treatment would

---

[22]    As this court has previously recognized, "Mr. Edelman has a Bachelor of Arts from Ohio University in Political Science and Psychology and a Masters of Education from the University of Pittsburgh in Rehabilitation Counseling. He has participated in a number of local graduate school practicum and internships, and since 1975, he has been in the private practice of vocational rehabilitation counseling and consultation. He is an independent and unbiased consultant expert witness to the Office of Disability Adjudication and Review, Social Security Administration." *Metz v. Astrue*, 2010 U.S. Dist. LEXIS 97566, *30 n. 24 (W.D. Pa. 2010) (internal citations omitted).

end around March 2010.[23] (*Id*.). She testified that she was planning to change liver specialists again. She explained that Dr. Stokes had declined to complete paperwork for her husband to get time off work and had given her problems with calling in prescriptions. (R. at 325–326).

Plaintiff testified that she began receiving blood transfusions a week prior to the hearing and the transfusions would continue throughout her hepatitis treatment. (R. at 330, 340). She said that after the first transfusion she "slept for 4 days straight," and her father helped her during this time. (R. at 338–339).

Plaintiff denied any past hospitalizations for psychiatric treatment and reported currently seeing her psychiatrist monthly. (R. at 333). She testified that she was being treated for "severe depression" and "anxiety," which caused her to "feel really bad about [herself]," isolated, and become angry. (R. at 334).

Plaintiff testified that she had previously used cocaine and heroin, but had been sober for five years. (R. at 335–336). She reported attending NA meetings and the methadone program. (R. at 336). Plaintiff also revealed a 6-day admission to Twin Lakes for inpatient heroin addiction treatment when she was 16. (*Id*.). Plaintiff then testified that she goes to the methadone clinic three days each week, sometimes meeting with a counselor. (R. at 343). She said that different people drive her there because she is not supposed to drive. (*Id*.).

Plaintiff described her daily routine as follows. She wakes up around 8:00 am and tries to give her son breakfast if family members are unavailable to help. (R. at 337). She then lays on the couch for the rest of the day while her son plays and watches television because "[i]t's really hard for [her] to keep [her] eyes open." (*Id*.). She testified that she goes out of the house if she has appointments or errands that other people cannot complete for her. (*Id*.). Plaintiff

---

[23]    For hepatitis C, genotype 1, "[c]ombination therapy [of Pegasys plus ribavirin] is given for 1 [year]." MERCK MANUAL, *supra* n. 3, at 230.

stated that she tries to do housekeeping, but her husband and father assist because she gets "really out of breath and sick," causing her to need to lay down often. (R. at 337–339). Plaintiff further testified that her father and husband have used up all of their vacation time in order to help her, and that her grandmother provides only limited assistance because of her advanced age. (*Id.*). Although Plaintiff stated that her doctors were concerned about fluid in her lungs or cancer in her liver, she clarified that no definitive findings had been made. (R. at 340).

Plaintiff further testified that during her hepatitis treatment she was restricted from contact with large groups of people because her immune system was low. (R. at 341). She reported problems concentrating and focusing on tasks, describing that if she starts to read a few pages, she falls asleep. (R. at 341–342). She complained of medication side effects including fatigue, stomach pain, and headaches. (R. at 342).

Mr. Edelman testified that Plaintiff's previous work as a nursing assistant was unskilled, and that while this job is classified as "medium," he considers it "heavy." (R. at 345). He then testified that Plaintiff is no longer able to perform this work. (*Id.*). ALJ Chain asked him whether jobs existed for a hypothetical individual who is restricted to sedentary work, with only occasional bending, squatting, kneeling, climbing, crawling, or crouching; occasional exposure to dust, fumes, gases, or odors; occasional reaching, pushing, or pulling with the upper extremities and no pushing or pulling with the lower extremities. (R. at 345–346). In response, he testified that jobs are available meeting these needs, including those of cashier, telephone solicitor, and gate guard. (R. at 346–347). ALJ Chain then asked about on-task performance and attendance requirements, and Mr. Edelman testified that no unskilled jobs are available nationally if an employee is off-task more than 10% of the time or absent more than twice per month. (R. at 347–48).

Upon cross-examination, Plaintiff's attorney asked whether contact limitations might affect job availability, pointing out that jobs may involve contact with the general public as well as with other employees. (R. at 348–349). During this line of questioning, ALJ interrupted to ask a follow-up hypothetical that clearly included contact limitations with both the general public and with coworkers. (R. at 349). Specifically, ALJ Chain asked about a hypothetical worker requiring sedentary work, with "mental limitations of simple, routine tasks," requiring "short, simple instructions," "no production rate pace," "no more than occasional interaction with the public, coworkers, and supervisors," and "simple workplace decisions with few workplace changes." (R. at 349–350). Mr. Edelman replied indicating several such jobs are available in the national economy, namely: sorter/grader, assembly worker, and hand packer. (R. at 350). However, he also testified that more than two absences per month would be unacceptable in these jobs. (*Id.*)

### D.     ALJ's Decision

The ALJ issued her decision on September 14, 2009, concluding that Plaintiff had "not been under a disability from May 15, 2007 through the date of this decision." (R. at 13).

In her decision, the ALJ made the following determinations: (1) Plaintiff meets the insured status requirements of the Social Security Act through March 31, 2009, but not thereafter (R. at 15); (2) Plaintiff had not engaged in substantial gainful activity since May 15, 2007 (*Id.*); (3) Plaintiff had the following impairments: hepatitis C, anemia, degenerative disc disease of the cervical and lumbar spine, major depressive disorder, post-traumatic stress disorder, panic disorder, and history of polysubstance abuse (*Id.*); (4) Plaintiff did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (R. at 16); (5) Plaintiff has the residual functional capacity

to perform sedentary work, except that she can do no more than occasional bending, squatting, kneeling, climbing, crouching, and crawling; can only occasionally use her upper or lower extremities for pushing or pulling; can only occasionally be exposed to dust, fumes, gases, or odors; is limited to simple, routine tasks learned through short simple instructions; can make only simple work- related decisions and should work in a setting with few workplace changes; she cannot work at a production pace rate; she can only occasionally interact with the public, coworkers, or supervisors  (R. at 17.); (6) Plaintiff is unable to perform any past relevant work (R. at 20); (7) Plaintiff is classified as a "younger individual" under the Social Security Act (*Id*.); (8) Plaintiff has a limited education and can communicate in English (*Id*.); (9) Transferability of job skills is not an issue because her past relevant work is unskilled (*Id*.); and (10) Significant numbers of jobs exist in the national economy that Plaintiff can perform (R. at 21).

The ALJ determined that Plaintiff had "mild restriction" in her activities of daily living, which were caused by physical disorders.  (R. at 16).  ALJ Chain opined that Plaintiff "probably cannot handle detailed instructions in a work setting," but that "there is no showing that her ability to function in this area has been more than moderately limited for any continuous period of twelve months or more."  (*Id*.).

From the record, ALJ Chain found that Plaintiff's hepatitis C has not been disabling.  (R. at 19).  She stated that Plaintiff had few complaints related to this disease before active treatment began.  (*Id*.).  Although ALJ Chain determined that Plaintiff has experienced fatigue and weakness caused by hepatitis C and anemia, she noted that the hepatitis C treatment began a few months before the hearing, and so Plaintiff had not experienced side effects from the treatment for more than twelve months.  (R. at 18).  Furthermore, she recognized that "the medical evidence of record does not confirm the degree of treatment-related incapacitation reported by

[Plaintiff]." (*Id*.). Additionally, ALJ Chain found that the medical evidence does not support the assertion that the hepatitis C treatment will continue for a year or that Plaintiff will experience side effects throughout this time. (R. at 19).

IV.    **Standard of Review**

Judicial review of the Commissioner's final decisions on disability claims is governed by statute. 42 U.S.C. §§ 405(g)1, 1383(c)(3).[24]  Pursuant to 42 U.S.C. § 405(g), a district court is to review the transcripts and records upon which the Commissioner based his determination.  42 U.S.C. § 405(g).  Because the standards for eligibility under Title II (42 U.S.C. §§ 401–433, regarding DIB), and judicial review thereof, are virtually identical to the standards under Title XVI (42 U.S.C. §§ 1381–1383f, regarding SSI), regulations and decisions rendered under the Title II disability standard 42 U.S.C. § 423, are pertinent and applicable in Title XVI decisions rendered under 42 U.S.C. § 1381(a). *Sullivan v. Zebley*, 493 U.S. 521, 525 n. 3, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990); *Burns v. Barnhart*, 312 F.3d 113, 119 n. 1 (3d Cir. 2002).

When reviewing a decision, the district court's role is limited to determining whether substantial evidence exists in the record to support an ALJ's findings of fact. *Burns*, 312 F.3d at 118.  Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate" to support a conclusion. *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995) (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)).  If the ALJ's findings of fact are supported by substantial

---

[24]    42 U.S.C. § 1383(c)(3) provides in pertinent part: "The final determination of the Commissioner of Social Security after a hearing under paragraph (1) shall be subject to judicial review as provided in section 405(g) of this title to the same extent as the Commissioner's final determinations under section 405 of this title. 42 U.S.C. § 1383(c)(3)."

evidence, they are conclusive. 42 U.S.C. § 405(g); *Richardson*, 402 U.S. at 390. When considering a case, a district court cannot conduct a *de novo* review of the Commissioner's decision nor re-weigh the evidence of record; the court can only judge the propriety of the decision in reference to the grounds invoked by the Commissioner when the decision was rendered. *Palmer v. Apfel*, 995 F.Supp. 549, 552 (E.D.Pa. 1998); *S.E.C. v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947). In short, the court can only test the adequacy of an ALJ's decision based upon the rationale explicitly provided by the ALJ; the court will not affirm or reverse a determination by substituting what it considers to be a proper basis. *Chenery*, 332 U.S. at 196–97. Further, "even where this court acting *de novo* might have reached a different conclusion ... so long as the agency's factfinding is supported by substantial evidence, reviewing courts lack power to reverse either those findings or the reasonable regulatory interpretations that an agency manifests in the course of making such findings." *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1191 (3d. Cir. 1986).

To be eligible for social security benefits under the Act, a claimant must demonstrate that she cannot engage in substantial gainful activity because of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of at least 12 months. 42 U.S.C. § 423(d)(1)(A); *Brewster v. Heckler*, 786 F.2d 581, 583 (3d Cir. 1986). The ALJ must utilize a five-step sequential analysis when evaluating whether a claimant has met the requirements for disability. 20 C.F.R. §§ 404.1520, 416.920.

The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or a combination of impairments that is severe; (3) whether the medical evidence of the claimant's impairment or

combination of impairments meets or equals the criteria listed in 20 C.F.R., Pt. 404, Subpt. P, Appx. 1; (4) whether the claimant's impairments prevent her from performing her past relevant work; and (5) if the claimant is incapable of performing her past relevant work, whether she can perform any other work which exists in the national economy. 20 C.F.R. § 404.1520(a) (4). *See Barnhart v. Thomas*, 540 U.S. 20, 24–25, 124 S.Ct. 376, 157 L.Ed.2d 333 (2003). If the claimant is determined to be unable to resume previous employment, the burden shifts to the Commissioner (Step 5) to prove that, given claimant's mental or physical limitations, age, education, and work experience, she is able to perform substantial gainful activity in jobs available in the national economy. *Doak v. Heckler*, 790 F.2d 26, 28 (3d Cir.1986).

## V. Discussion

The ALJ concluded that Plaintiff had several medically determinable severe impairments, including hepatitis C, anemia, degenerative disc disease of the cervical and lumbar spine, major depressive disorder, post-traumatic stress disorder, panic disorder, and history of polysubstance abuse. (R. at 15). However, the ALJ determined that Plaintiff was not disabled because she possessed sufficient functional capacity to perform sedentary work with multiple limitations, including a clean working environment, occasional use of extremities, simple and routine tasks, simple work-related decisions, no production rate pace, few workplace changes, and only occasional interaction with other people. (R. at 17).

In her Motion for Summary Judgment, Plaintiff asserts that the Commissioner's decision should be overturned because it is allegedly not supported by substantial evidence.[25] (Docket

---

[25] The Court notes that in her Brief in Support of Plaintiff's Motion for Summary Judgment and Plaintiff's Statement of Material Facts, Plaintiff's attorney makes representations about multiple medical issues that were not included in the administrative record, and therefore not considered by the ALJ. (Docket No. 5 at 2–4; No. 5-3 at 1–2). These representations include assertions that Plaintiff has required multiple inpatient hospitalizations for blood

No. 7 at 1). Plaintiff generally argues that her "restrictions and limitations do not allow her to perform any type of work on a regular and dependable basis." (*Id*. at 7). To support this argument, Plaintiff asserts that: 1) the ALJ improperly weighed the credibility of different providers, specifically by giving limited weight to evidence submitted by Plaintiff's primary medical doctor; 2) the ALJ improperly discredited Plaintiff's self-reports regarding her symptoms and level of functioning; 3) the ALJ failed to consider whether the combined effects of Plaintiff's conditions meet the criteria for an impairment listed in 20 C.F.R. § 4040.1520(d); and, 4) the ALJ failed to consider the Vocational Expert's testimony that no jobs would be available for a person with Plaintiff's functional capacity and with additional concentration and attendance limitations. (*Id*. at 7–9). In response, Defendant argues that the administrative record does contain substantial evidence supporting the ALJ's determination that the Plaintiff's impairments are not expected to continue for twelve months and that a significant number of jobs are available in the national economy that Plaintiff can perform. (Docket No. 12 at 16–18). This Court considers each of Plaintiff's arguments, in turn.

---

transfusions, an operation to place a blood clot screen in her heart, and complications with her Ribavirin dose. (*Id.*) This Court may only review that evidence upon which the ALJ based her decision. *Matthews v. Apfel*, 239 F.3d 589, 594–95 (3d Cir. 2001); 42 U.S.C. § 405(g). A claimant may present new evidence on appeal to support a motion for remand, if the evidence is new, materially relates to the claimant's alleged disability during the relevant time period, and if claimant shows good cause for not submitting the evidence earlier. *Szubak v. Sec'y of Health and Human Svcs.*, 745 F.2d 831, 833–34 (3d Cir. 1984). In the present case, Plaintiff has not explicitly requested a remand, but instead generally maintains that this Court overturn the ALJ's determination. (Docket No. 5 at 1). Further, Plaintiff has submitted no evidence to support the representations counsel makes regarding the alleged deterioration of Plaintiff's conditions as she has only offered bare assertions from her counsel in this regard. Counsel represents that Plaintiff's "condition continues to worsen," indicating that these symptoms may have arisen after the ALJ issued her decision and are immaterial to the time period under consideration, i.e., from May 15, 2007 (alleged onset date) through August 13, 2009 (hearing date). (*Id.* at 2). Therefore, consistent with the aforementioned authority, this court limits its review to materials contained in the administrative record. We note that if Plaintiff's condition has indeed worsened after the time period under consideration, she may reapply for disability benefits. *See* 42 U.S.C. § 405.

## 1.     ALJ's Determinations on Credibility of Experts

First, Plaintiff argues that the ALJ improperly assessed the credibility of conflicting experts.  (Docket No. 7 at 4-5).  Plaintiff focuses on evidence submitted by Dr. Heil, the state-appointed psychologist who conducted Plaintiff's Psychiatric Review and a Mental Residual Functional Capacity Assessment, and by Dr. Nino, Plaintiff's primary medical doctor who completed a Work Capacity Evaluation and a Physician's Short-Form.  (R. at 116–131, 248–251).  Dr. Heil concluded that Plaintiff's psychological symptoms were not disabling, while Dr. Nino concluded on a check-box form that Plaintiff is indefinitely disabled and unable to perform activities of daily living because of her hepatitis C treatment.  (R. at 131, 248, 251).  Plaintiff asserts that Dr. Heil's assessment is "deficient" and not supported by facts.  (Docket No. 7 at 4).  Plaintiff also asserts that the ALJ erred by according less weight to Dr. Nino's evaluation, arguing that his evaluation must be accorded greater weight because he is Plaintiff's primary care physician.  (*Id*. at 5, 8).

In considering and weighing all relevant probative evidence on record, an ALJ must assess how credible the evidence is.  *Fargnoli v. Massanari*, 247 F.3d 34, 42–43 (3d Cir. 2001). In the disability context, the ALJ must assess medical experts' credibility.  *Id*.  If multiple experts proffer conflicting probative evidence, the Third Circuit has "recognize[d] a particularly acute need" for ALJs to explain the reasoning underlying their determinations.  *Id*. at 42.   In assessing credibility, an ALJ should give more weight to a treating physician's opinion because "these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief

hospitalizations." *Id*. at 43 (citing 20 C.F.R. § 404.1527(d)(2)); *see also Brownawell v. Comm'r of Soc. Sec.*, 554 F.3d 352, 355 (3d Cir. 2008).

The Court of Appeals has consistently held that a "treating physician's opinion may be rejected only on the basis of contradictory medical evidence, although the opinion may be accorded more or less weight depending upon the extent to which supporting explanations are provided." *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999); *see also Brownawell*, 554 F.3d at 355. When rejecting a treating physician's findings or according such findings less weight, an ALJ must be as "comprehensive and analytical as feasible" and provide the factual foundation for the decision and specific findings that were rejected. *Cotter v. Harris*, 642 F.2d 700, 705 (3d Cir. 1981). Such an explanation is not required to match the rigor of "medical or scientific analysis," since the ALJ is a "non-scientist." *Id*.

In our case, the record shows that the ALJ sufficiently considered all expert opinions in the record.

As noted above, Plaintiff argues only that the ALJ's analysis of Dr. Heil's opinions was "deficient." (Docket No. 7 at 4). Given that she relies only on this bare assertion of her counsel, without pointing to any contrary medical evidence in the record, the Court does not consider this to be a meaningful challenge to the ALJ's adoption of Dr. Heil's opinions that Plaintiff's psychological impairments did not render her disabled.[26] In any event, having reviewed the record, the Court finds that the ALJ sufficiently weighed and considered the evidence as to Plaintiff's psychological impairments, symptoms and limitations, and correctly concluded that the same did not render her disabled under the Act.

---

[26]     Indeed, the Commissioner does not even address this argument in his motion for summary judgment. (*See* Docket No. 12). However, the Court considers this argument for completeness.

In her decision, the ALJ meaningfully considered the evidence of record which – from her view – demonstrated that Plaintiff experiences functional difficulties because of her psychological symptoms, but she does not experience marked limitations. (R. at 16). For example, the ALJ notes that while Plaintiff's social functioning is impaired in that she isolates, the evidence shows that Plaintiff can interact appropriately with her family and attend medical appointments, and the ALJ observed that Plaintiff showed no outward signs of stress at the disability hearing. (R. at 16). The ALJ included multiple restrictions to Plaintiff's RFC based on her psychological impairments, such as limiting Plaintiff to simple, routine tasks and few workplace changes. (R. at 17). Therefore, the ALJ's determination that Plaintiff's psychological condition does not preclude employment is supported by substantial evidence.

Plaintiff offers a more fully supported argument concerning Dr. Nino's August 11, 2009 evaluation of Plaintiff's functional capacity and his conclusion that Plaintiff's hepatitis C and resulting treatment rendered her disabled. (Docket No. 7 at 4-5, 8). However, this argument likewise fails because the ALJ's decision to disregard much of Dr. Nino's assessment is supported by substantial evidence.

Two days before the administrative hearing, on August 11, 2009, Plaintiff saw Dr. Nino at which time he completed a check-the-box evaluation form on her behalf. (R. at 248–251). In this brief assessment, Dr. Nino states that Plaintiff was unable to perform activities of daily living because of her "chemotherapy for Hepatitis C." (R. at 248). He marked that Plaintiff was not able to: lift or carry, work at unprotected heights, work around moving machines, or be exposed to marked temperature changes. (R. at 248–250). Dr. Nino assessed that Plaintiff could occasionally: use her head and neck, bend, squat, kneel, climb, and crawl, be exposed to dust, fumes, gases, and odors, reach above or below shoulder level, or use her hands and arms for

pushing and pulling. (*Id*.). But, he also noted that Plaintiff could "frequently": use her hands and arms for grasping and manipulation. (R. at 250). Dr. Nino then checked the box which states that Plaintiff was "disabled" and noted that she was restricted indefinitely. (R. at 251).

The ALJ specifically evaluated this evidence as follows:

> As for the opinion evidence [from Dr. Nino], the [ALJ] gives no weight to the assessment by Dr. Nino that she cannot lift even 0-10 pounds, cannot sit, stand, and walk for more than a total of three hours in a workday, that she cannot perform activities of daily living, and that she is disabled (Exhibit B-9F). This assessment clearly is based on the claimant's self-description of limitations. The [ALJ] notes that the claimant actually does perform most activities of daily living, except that she has required some help due to treatment related-fatigue over the past few weeks or months. This symptom can neither be reasonably related all the way back to the alleged onset date nor projected forward for twelve months. Dr. Nino is not treating the claimant for hepatitis C and anemia that cause these purported limitations, and therefore his opinion as to the efficacy of treatment and the claimant's residual functional capacity is accorded less weight. I have credited his prohibition of repetitive use of the lower extremities, and of use of the upper extremities for pushing and pulling, but cannot accept his opinion that the claimant is disabled because that determination is reserved for the Commissioner of Social Security.

(R. at 20).

This Court believes that the ALJ's assessment of Dr. Nino's opinions regarding Plaintiff's disability and limitations are supported by substantial evidence and consistent with prevailing precedent. In so doing, the ALJ rejected the limitations suggested by Dr. Nino to the extent that they were not supported by the medical evidence in the record but adopted those that were supported by medical evidence.

At the outset, the ALJ properly recognized the well-settled principle that the disability determination is one that is reserved solely for the Commissioner. As this Court has repeatedly recognized, the determination of disabled status under the Act by a medical professional "will

not be affected by a medical source simply because it states that a claimant is 'disabled,' or 'unable to work.'" *Cerrone v. Astrue*, 2010 WL 2697923, at *11 (W.D.Pa. Jul. 7, 2010) (citing 20 C.F.R. § 416.927(e)). Therefore, the ALJ was not bound by Dr. Nino's opinion that Plaintiff was disabled in any fashion.

In addition, Dr. Nino's assessment of Plaintiff's disability consisted merely of a check-box form with no accompanying explanation supporting his opinion that Plaintiff is indefinitely disabled due to her hepatitis treatment and anemia. (R. at 248–51). The United States Court of Appeals for the Third Circuit has ruled that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best" of disability and when they are "unaccompanied by thorough written reports, their reliability is suspect." *Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993); *see also Sylvester v. Comm. of Soc. Sec.*, 2011 WL 470257, at *13 (W.D.Pa. Feb. 4, 2011) (quoting same). As the challenged limitations noted by Dr. Nino in the check-the-box form were not supported by objective medical evidence, the ALJ was free to discredit Dr. Nino's opinions as to same.

Further, Dr. Nino opined that Plaintiff's limitations stem from her hepatitis treatment, but Dr. Nino was not treating Plaintiff for hepatitis C or for her resulting anemia. (R. at 20). Therefore, Dr. Nino's opinions were not entitled to "great weight", as Plaintiff suggests. Instead, as the ALJ noted, Dr. Stokes and Dr. Ruthardt treated Plaintiff's hepatitis C, and Dr. Peracha treated Plaintiff's anemia. (R. at 90, 133, 141, 276). And, none of these medical professionals found Plaintiff to be disabled or having the type of severe limitations noted by Dr. Nino. In fact, in March of 2009, Dr. Stokes declined Plaintiff's request to provide her with documentation that she was disabled because of her hepatitis treatment, and he wrote that it is "rare" for people to

become disabled from the treatment's side effects.[27]  (R. at 138).  Dr. Ruthardt noted in early 2009 that after four weeks of hepatitis treatment, Plaintiff's viral load was undetectable, which indicates a good prognosis.  (R. at 141).  Regarding Plaintiff's anemia, Dr. Peracha documented that Plaintiff experienced fatigue and had low hemoglobin levels, but the anemia treatment targeted these symptoms.  (R. at 276).  Because Plaintiff began treatment for hepatitis and anemia in March and June 2009, respectively, the ALJ reasonably concluded that any limitations these conditions caused were not expected to persist for twelve months.  (R. at 19).  Indeed, there is no evidence which suggests otherwise.

Finally, the ALJ also properly rejected the limitations Dr. Nino placed on Plaintiff to the extent that they contradicted the evidence of record as to her ability to perform certain activities of daily living.  In large part, the ALJ concluded that Dr. Nino's assessment of these limitations was based upon Plaintiff's subjective statements of her symptoms rather than rooted in objective medical evidence.  The ALJ is free to weigh all of the evidence when considering or rejecting a physician's opinion and provide sufficient explanation for discrediting any evidence she rejects. *See Plummer*, 186 F.3d at 429 ("The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects.").  And, for the reasons set forth in the following section, the Court finds no error in the ALJ's analysis of Plaintiff's credibility or her subjective descriptions of her symptoms and pain.

For these reasons, the ALJ's determinations to disregard Dr. Nino's summary opinion that Plaintiff was disabled from hepatitis C treatment and anemia and to discount many of the limitations he cited is supported by  substantial evidence.

---

[27]     Plaintiff testified that she disagreed with Dr. Stokes' assessment in this regard and that she was attempting to find another specialist to treat her conditions because of Dr. Stokes' refusal to provide her with a statement that she was disabled. (R. at 325–326).    At the time of the hearing, Plaintiff had terminated her relationship with Dr. Stokes and was searching for another specialist. (*Id.*).  Thus, the records from Dr. Stokes and his practice group end a few months before the hearing.

## 2.     ALJ's Assessment of Plaintiff's Credibility

In a related argument, Plaintiff contends that the ALJ's determination must be reversed because the ALJ failed to give appropriate weight to Plaintiff's self-reported limitations. (Docket No. 7 at 5-6, 8-9).  To support this argument, Plaintiff points to her testimony about experiencing extreme fatigue, pain, and psychological problems which affect her functioning. (*Id*. at 5-6).

When a claimant makes subjective complaints of symptoms such as pain or fatigue, the ALJ must assess that claimant's credibility and look to whether objective medical evidence supports these allegations.  *Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999); 20 C.F.R. § 404.1529; *see also Nichols v. Astrue*, 2010 WL 324388, at *15 (W.D.Pa. Jan. 21, 2010), *aff'd*, 404 F.App'x 701 (3d Cir. 2010).  The ALJ is required to assess the intensity and persistence of a claimant's pain, and determine the extent to which it impairs a claimant's ability to work.  (*Id*.). This includes determining the accuracy of a claimant's subjective complaints.  (*Id*.).  However, allegations of symptoms like pain must be consistent with the objective medical evidence in the record.  *Ferguson v. Schweiker*, 765 F.2d 31, 37 (3d Cir. 1985); *Burnett*, 220 F.3d at 122.  If the ALJ rejects Plaintiff's subjective complaints, then the ALJ must support this decision with an explanation based on evidence from the record.  *Mason v. Shalala*, 994 F.2d 1058, 1067–69 (3d Cir. 1993).

In this Court's opinion, the ALJ properly considered the credibility of Plaintiff's testimony in determining her level of functioning.  Further, the ALJ's general concerns about the Plaintiff's credibility are supported by substantial evidence.  To this end, Plaintiff claimed on her application that she stopped working because of her impairments but later testified that that she stopped working because of a pregnancy, not because of any such impairments.  (R. at 18).  In

addition, Plaintiff testified that she ended her relationship with Dr. Stokes – who was treating her hepatitis C – because Dr. Stokes refused to provide her with a note or other notice that she was disabled per her request. (R. at 325-326). These inconsistencies in her statements and apparent attempt to influence her former physician's opinion clearly undermine Plaintiff's credibility.

With respect to her complaints of specific symptoms, the ALJ explicitly found support in the record as to Plaintiff's complaints of weakness, fatigue, pain, depression, and anxiety, but the ALJ questioned Plaintiff's testimony as to the persistence and severity of these symptoms. (R. at 18–20). The ALJ found little objective medical evidence supporting Plaintiff's testimony about the severity of her symptoms. (R. at 18–19). Plaintiff also has a documented history of psychiatric and substance abuse problems, but she is now in active treatment for both conditions, reports that her depression is controlled, and has not required inpatient or intensive outpatient care. (R. at 18). Regarding her physical impairments, the ALJ concluded that the objective medical evidence, such as blood work, liver studies, and physicians' notes, indicate that Plaintiff's hepatitis C is not disabling. (R. at 19). While the record indicates that the treatment regimen Plaintiff had initiated caused side effects, the ALJ notes that no evidence supported Plaintiff's testimony that the treatment would last for one year or that Plaintiff was expected to continue experiencing adverse reactions to such treatment. (R. at 19). Instead, the ALJ recognized that the evidence indicates that Plaintiff's medical and psychological conditions are likely to improve since she is undergoing active treatment. (R. at 18). This inference is certainly reasonable given the lack of any medical evidence to the contradictory.

For these reasons, this Court finds that the ALJ properly considered Plaintiff's testimony in light of the administrative record, and that the ALJ did not err in finding Plaintiff's testimony partially credible.

3. **ALJ's Determination that Plaintiff Does Not Meet or Exceed a Listed Impairment under Step 3.**

Third, Plaintiff argues that the ALJ provided insufficient explanation in her determination that Plaintiff's impairments do not constitute one of the listed impairments set forth in the Code of Federal Regulations. 20 C.F.R. Pt. 404 Subpt. P, Appx. 1. (Docket No. 7 at 8). Plaintiff does not argue that she meets the criteria for any specific Listed Impairment, but argues more generally that the ALJ's determination on this issue is not supported by sufficient explanation. (*Id.*). This Court disagrees.

In determining whether Plaintiff meets the requirements of a Listed Impairment, the ALJ must properly analyze the entire record and explain her determination as to whether the Plaintiff's condition amounts to one of those set forth as a Listed Impairment. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119–20 (3d Cir. 2000). An impairment must manifest all of the specified medical criteria to constitute a Listed Impairment. *Williams v. Sullivan*, 970 F.2d 1178, 1186 (3d Cir. 1992) (quoting *Sullivan v. Zebley*, 439 U.S. 521 (1990)). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." (*Id.*).

The case upon which Plaintiff relies stands for the proposition that in determining whether a claimant's impairments equal a Listed Impairment, the ALJ must sufficiently analyze the record so that the determination can be reviewed on appeal by this Court or the Court of Appeals. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 119–20 (3d Cir. 2000). In *Burnett*, the Third Circuit considered an ALJ's conclusion that the claimant did not meet a Listed Impairment, where the ALJ provided no supporting explanation. *Id.* The Court of Appeals explained, "[b]ecause we have no way to review the ALJ's hopelessly inadequate step three

ruling, we will vacate and remand the case for a discussion of the evidence and an explanation of reasoning." (*Id*. at 120). Subsequently in *Jones v. Barnhart*, 364 F.3d 501, 505 (3d Cir. 2004), the Court of Appeals clarified its earlier holding in *Burnett*. In *Jones*, the Court of Appeals adopted a "more flexible approach" at step 3. *Scatorchia v. Comm'r of Soc. Sec.*, 137 F.App'x 468, 470-71 (3d Cir. 2005); *see also Scuderi v. Comm'r of Soc. Sec.*, 302 Fed. App'x 88, 90 (3d Cir. 2008). Rather than requiring the ALJ to identify appropriate Listings based on the claimant's alleged impairments, the Court of Appeals held in *Jones* that the ALJ "satisfied this standard by clearly evaluating the available medical evidence in the record and then setting forth that evaluation in an opinion, even where the ALJ did not identify or analyze the most relevant Listing." *Id*.

In this Court's estimation, the ALJ did not err in the manner described by the Court of Appeals in *Burnett* and certainly did not violate the more flexible approach later adopted by the Court of Appeals in *Jones*. Instead, the ALJ dedicates an entire page of her analysis (R. at 16) to a discussion of whether Plaintiff had any impairments which met or medically equaled one of the Listings. Therefore, the instant case is certainly not a situation where the ALJ's discussion is "hopelessly inadequate," precluding meaningful judicial review, as in *Burnett*. *Burnett*, 220 F.3d at 119-20. As noted, Plaintiff has not argued that she should have qualified under any specific Listing, nor has she cited any errors by the ALJ in her reasoning that Plaintiff did not qualify for same. But, she has the burden on appeal to demonstrate to this Court that the ALJ's decision is not supported by substantial evidence. *See Burns*, 312 F.3d at 118. Because she has not raised any such specific objection to the ALJ's finding that she does not meet the requirements for any Listed Impairment, and she bears the burden of raising any such objection, this Court concludes that the ALJ's decision is supported by substantial evidence.

### 4. ALJ's Determination Regarding Plaintiff's Capacity to Work with Respect to Concentration and Attendance

Fourth, Plaintiff argues that the ALJ's decision is not supported by substantial evidence because the ALJ erroneously failed to include restrictions regarding her ability to concentrate and deficiencies in her attendance – limitations which the vocational expert, Mr. Edelman found would preclude employment. (Docket No. 7 at 8). The Court again disagrees.

During Plaintiff's disability hearing, the ALJ posed several hypothetical questions to the vocational expert, Edelman. (R. at 345–50). Edelman testified that a significant number of jobs are available for a hypothetical worker with each restriction included in Plaintiff's RFC. (R. at 17, 349–50). Yet, Plaintiff's argument focuses on Edelman's testimony relating to a different hypothetical question posed by the ALJ. This argument references the following between the ALJ and Edelman ("VE"):

> ALJ: And can you tell me what is the on-task performance requirement for unskilled work?
> VE: In unskilled work there must be on-task 90 percent of the time, so if you are off-task more than 10 percent of the time, there would be no jobs you could perform.
> ALJ: So of course my question is if an individual were off-task more than 10 percent, would there be work available?
> VE: There would not be.
> ALJ: Okay. And what is the attendance requirement for unskilled work?
> VE: Unskilled work, once (*sic*) absence a month is acceptable, two on occasion. More than that is unacceptable.
> ALJ: So more than one … on a consistent basis, if an individual were absent in that regard, would there be work available?
> VE: There would not be.

(R. at 347–48). Plaintiff asserts that Edelman's testimony "confirm[s] that … there is not work available considering the amount of off task time and absences she would incur in attempting gainful employment."[28] (Doc. No. 7 at 7-8).

An ALJ may consider a vocational expert's testimony as to what occupations are available to someone with a claimant's skills and limitations. 20 C.F.R. § 404.1566(e). The United States Court of Appeals for the Third Circuit has clarified the role of a vocational expert's testimony during disability hearings. *Rutherford v. Barnhart*, 399 F.3d 546 (3d Cir. 2005). The Court of Appeals recognized that in many disability hearings, an ALJ poses multiple hypothetical limitations to a vocational expert, who testifies as to whether such as person could perform a job, and whether such jobs are available in the economy. *Id*. at 553. This testimony is only relevant in determining disability with regards to the hypothetical limitations that are ultimately included in that claimant's RFC. *Id*. at 553–54 (citing *Podedworny v. Harris*, 745 F.2d 210, 218 (3d Cir. 1984)). That is, the vocational expert's testimony is only relevant in response to a hypothetical containing "all of a claimant's *credibly established limitations*." *Id*. at 554 (emphasis in original). Therefore, if an ALJ (or claimant's counsel) poses hypothetical impairments that are not credibly established limitations and are not incorporated into the RFC, a vocational expert's responsive testimony is not relevant to determining whether the claimant is disabled. *Id*.

The question for this Court then becomes whether the ALJ in this case incorporated all of Plaintiff's credibly established limitations into her RFC. Although Plaintiff does not directly attack the RFC, her argument implies that the ALJ erred by not including concentration and

---

[28] The Court notes that Plaintiff does not dispute that the ALJ conveyed to Edelman each limitation contained in Plaintiff's RFC. The record explicitly shows that the ALJ posed a hypothetical containing each limitation which she adopted in Plaintiff's RFC. (R. at 17, 349–50). Edelman responded that person with these functional limitations could work as a sorter/grader, an assembly worker, or a hand packer, and that a significant number of these jobs are available in the national economy. (R. at 350).

attendance limitations in Plaintiff's RFC. (Docket No. 7). If the ALJ had included these limitations, then Edelman's testimony indicates that Plaintiff would not be capable of performing any jobs in the economy, and would therefore be disabled.

After reviewing the record, this Court concludes that the ALJ's determinations not to include concentration or attendance limitations in Plaintiff's RFC are supported by substantial evidence. From this Court's view, the ALJ explicitly considered Plaintiff's concentration and issues related to work attendance in her analysis of Plaintiff's residual functional capacity but properly concluded that such limitations were not supported by medical evidence. Regarding concentration, the ALJ noted evidence, including a mental status examination and ability to understand her treatment regimen, concluding that Plaintiff experiences moderate limitations. (R. at 16). The ALJ accounted for these limitations in Plaintiff's RFC by including restrictions such as no production rate pace, few workplace changes, and simple routine tasks learned through simple instruction. (R. at 17). Regarding attendance, the ALJ noted evidence that Plaintiff attends her medical appointments and has not required inpatient hospitalizations that would interrupt employment, discounting any suggestion that she would not be able to work based on attendance concerns. (R. at 18).

Because the hypothetical posed to the Vocational Expert reflected claimant's RFC, and that RFC is supported by substantial evidence, the Court holds that the hypothetical was sufficiently accurate. *Covone v. Comm'r Soc. Sec.*, 142 Fed.Appx. 585, (3d. Cir. 2005). Therefore, the ALJ's decision in this regard is likewise supported by substantial evidence.

**VI.    Conclusion**

In this Court's estimation, the Commissioner's decision denying Plaintiff's applications for DIB and SSI benefits is "supported by substantial evidence." 42 U.S.C. § 405(g). Accordingly, Plaintiff's motion for summary judgment will be denied, and the Commissioner's motion for summary judgment will be granted.  Appropriate Orders follow.


*s/Nora Barry Fischer*
Nora Barry Fischer
U.S. District Court


Date:   August 30, 2011

cc/ecf:  All counsel of record.